Exhibit A

Howard Declaration

CHAD A. READLER
Acting Assistant Attorney General
MARCIA BERMAN
Assistant Branch Director
EMILY S. NEWTON (Va. Bar No. 80745)
STUART J. ROBINSON (Cal. Bar No. 267183)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Tel: (202) 305-8356
Fax: (202) 616-8470
Email: emily.s.newton@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

ACLU FOUNDATION OF ARIZONA;
ACLU FOUNDATION OF SAN DIEGO
AND IMPERIAL COUNTIES,

      Plaintiffs,

v.

OFFICE FOR CIVIL RIGHTS AND
CIVIL LIBERTIES; U.S. DEPARTMENT
OF HOMELAND SECURITY; OFFICE
OF INSPECTOR GENERAL, U.S.
DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES
CUSTOMS AND BORDER
PROTECTION; UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY,

Case No. CV-15-00247-PHX-JJT

**DECLARATION OF PATRICK HOWARD (CBP) IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1

1
2   Defendants.
3

4          Pursuant to 28 U.S.C. § 1746, I, Patrick Howard, hereby declare as follows:

5   1.      I am a Branch Chief in the Freedom of Information Act ("FOIA") Division at U.S.
6   Customs and Border Protection ("CBP"). I have been a Branch Chief in the FOIA Division
7   in Washington, D.C. since February 8, 2015.  I oversee a staff of six Government
8   Information Specialists and the processing of FOIA requests submitted to CBP and, thus,
9   am familiar with CBP's procedures for responding to FOIA requests.  I provide technical
10  and administrative supervision and direction to a group of FOIA specialists in processing
11  FOIA requests, assist with FOIA/Privacy Act ("PA") litigation matters, and am personally
12  familiar with the processing of FOIA/PA responses, including by, at times, directly
13  reviewing responses for adequacy and adherence to federal laws and regulations.

14  2.      CBP is the largest federal law enforcement agency in the United States and is
15  charged with protecting U.S. borders against terrorists and the instruments of terror,
16  enforcing the customs and immigration laws of the U.S., and fostering our nation's
17  economy by facilitating lawful international travel and trade.  This mission includes the
18  detection and prevention of the illegal entry of aliens into the U.S.  Within CBP, the U.S.
19  Border Patrol ("USBP") is the primary federal law enforcement organization responsible
20  for preventing the entry of terrorists and their weapons from entering the United States,
21  and for preventing the illicit trafficking of people and contraband, between official CBP
22  ports of entry.  In the course of carrying out their missions, CBP and the USBP apprehend
23  many individuals, some of whom are minors.  Many of the records at issue in this case are
24  directly related to CBP's law enforcement activities and are used for border security and
25  enforcement purposes.

26  3.      I am familiar with the FOIA request submitted by the ACLU of Arizona and the
27  ACLU of San Diego and Imperial Counties (hereinafter "Plaintiffs") at issue in this
28  litigation.  All information contained herein is based upon information furnished to me in

my official capacity as a Branch Chief in CBP's FOIA Division.  The statements I make in this declaration are based on my personal knowledge, which includes knowledge acquired through information and documents made available to me in the course of the performance of my duties and agency records that I personally reviewed in the course of my official duties, as well as my experience and knowledge of the internal operations of this office and agency.

4.     The purpose of this declaration is to explain CBP's handling of Plaintiffs' FOIA request.  This declaration (i) summarizes the relevant facts and correspondence regarding Plaintiffs' FOIA request, (ii) explains the searches CBP conducted in responding to the request, (iii) details CBP's withholdings of responsive information pursuant to FOIA exemptions, in accordance with the requirements of *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), and (iv) addresses the segregability of documents partially withheld and withheld in full.

**I.     Plaintiffs' FOIA Request**

5.     On December 3, 2014, Plaintiffs filed a FOIA request with DHS's Privacy Office, seeking the disclosure of records related to the alleged "abuse and mistreatment of children in the custody of . . . CBP and its sub-agency, the Office of Border Patrol."  Complaint ("Compl.") ¶¶ 2, 22.  In particular, Plaintiffs requested six categories and six sub-categories of records "to include at least:

1. All Records relating to any alleged or actual verbal, physical, and/or sexual abuse of children in DHS custody, including, but not limited to, any incidents resulting in hospitalization.

2. All Records related to DHS compliance with child abuse reporting requirements under state and federal law, including but not limited to the Victims of Child Abuse Act of 1990; 42 U.S.C. § 13031; 8 C.F.R. § 81.2–81.3.

3. All Records related to DHS implementation of and compliance with the Prison Rape Elimination Act ("PREA").

4. All Records relating to

3

    a.  complaints of alleged or actual verbal, physical, and/or sexual abuse of children in DHS custody, and

    b.  complaints regarding conditions of confinement experienced by children in DHS custody submitted to any DHS entity by any person, non-governmental organization, state or federal government agency, tribal government, consular office, or any other entity, whether verbal or written, and all Records related or responding to any such complaints.

5.  All Records relating to

    a.  the three interim reports regarding Oversight of Unaccompanied Alien Children prepared by DHS OIG dated July 30, 2014, August 28, 2014, and October 2, 2014;

    b.  DHS OIG's decision, announced in a press release dated October 6, 2014, that it would begin curtailing its routine inspections at detention facilities for unaccompanied children;

    c.  any investigations by any DHS entity resulting from any complaints of alleged or actual verbal, physical, and/or sexual abuse of children in DHS custody; and

    d.  any investigations by any DHS entity resulting from any complaints regarding conditions of confinement experienced by children in DHS custody including all policies, protocols, or other guidelines for conducting investigations involving child complainants, and records sufficient to show the current status of all such investigations conducted from January 1, 2009 to the present.

6.  All disciplinary Records resulting from alleged or actual misconduct by DHS officials involving children in DHS custody, including any violation of state or federal law or Border Patrol, CBP, and/or DHS guidelines related to the treatment of children in DHS custody or conditions of confinement experienced by children in DHS custody."

Compl., Ex. A (ECF No. 1-1) at 5-6.  The time frame for the request was from January 1, 2009 to the present.  *Id.* at 5.  Plaintiffs further specified in footnote 16 of their request: "**Please note:** Should any responsive Record contain the personal identifying information of any third party, Requesters ask that the agencies redact that information.  This Request does *not* seek any personal or identifying information about any specific individual(s)."  *Id.*

6.     On February 11, 2015, Plaintiffs filed this lawsuit.  Prior to that, CBP's FOIA Division had not responded to Plaintiffs' request, and Plaintiffs did not file an appeal.

7.     In response to Plaintiffs' request, CBP released to Plaintiffs non-exempt portions of a total of 11,541 pages of records.  CBP has not charged Plaintiffs fees for this response.

## II.     CBP's Search for Responsive Records

8.     In response to Plaintiffs' FOIA request, CBP's FOIA Division contacted the following offices within CBP, which CBP FOIA determined were the only offices within CBP likely to have responsive records:  the USBP, the Office of Human Resources Management ("HRM"), the Office of Internal Affairs ("IA"), now known as the Office of Professional Responsibility ("OPR"), the CBP Situation Room ("SITROOM"), and the Custody Support and Compliance Division ("CSCD").[1]  Those offices, in turn, conducted reasonable searches, including searching all locations likely to have responsive records.  Those searches are described below.

9.     The aforementioned offices were provided a copy of the FOIA request and, based on their experience and knowledge of their program office practices and activities, forwarded the request and instructions to the appropriate individual employee(s) and/or component office(s) within the program office that they believed were likely to have responsive records.

---

[1] The FOIA Division also queried CBP's Office of Civil Rights and Civil Liberties ("CRCL"), which stated that its database is not searchable and that everything contained in their database is contained in the DHS CRCL database.  Any non-exempt, responsive records were accordingly produced to Plaintiffs directly by DHS CRCL.

10.   The individual(s) and component office(s) conducted searches of their file systems, including paper files and electronic files, which, in their judgment, based on their knowledge of the manner in which they routinely keep records, likely contained responsive records.

**A. Details of USBP's Search**

11.   USBP is the component within CBP that secures the United States' borders by detecting and preventing the entry of illegal aliens, terrorists and terrorist weapons, and other outside threats and reducing the likelihood that dangerous people and capabilities enter the United States between official ports of entry.  USBP's traditional mission is to enforce immigration laws and to detect, interdict, and apprehend those who attempt to illegally enter or smuggle people or contraband across U.S. borders between official ports of entry.  Some of USBP's major activities include maintaining traffic checkpoints along highways leading from border areas, conducting city patrol and transportation checks, and conducting anti-smuggling investigations.

12.   Per DHS policy, any records responsive to Plaintiffs' request would have been part of an allegation forwarded to OPR or DHS's Office of Inspector General ("OIG").  In addition, USBP tasked each of its twenty sectors to perform local searches for responsive records if, in their judgment and based upon their knowledge of the manner in which they routinely keep records, they were likely to have additional responsive records.

13.   Rio Grande Valley ("RGV") Sector searched its local electronic document management system ("Laserfiche") using the keywords:  "abuse," "sexual abuse," "unaccompanied children," "unaccompanied juvenile," "PREA," "Complaints," and "confinement."  In addition, RGV Sector searched its Significant Incident Report ("SIR") Module, the Intelligence and Operations Framework ("IOFS") system, ADHOC, and the Border Patrol Enterprise Reporting Tool ("BPERT").  These systems were searched using the keywords:  "unaccompanied juveniles" and "sexual assault."  RGV Sector provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

14.   The IOFS system permits CBP to relate information from several Automated Targeting System ("ATS") modules (specifically ATS-P and ATS-Inbound) and portions of other CBP and federal agency systems (e.g., enforcement case tracking, Border Patrol SIRs, and the U.S. Department of State's Consolidated Consular Database ("CCD") and Passport Information Electronic Records System ("PIERS")) to support case development and collaboration between field and headquarters analytical staffs.  IOFS supports the work of both Office of Field Operations officers and Border Patrol agents at the ports of entry, in the field, and in the National Targeting Centers.

15.   ATS is a decision support tool that compares traveler, cargo, and conveyance information against law enforcement, intelligence, and other enforcement data using risk-based scenarios and assessments.

16.   ADHOC is the Office of Border Patrol's ("OBP") report building system, and is used to build custom queries for USBP statistics, such as apprehensions by sector, number of minors apprehended by sector, drug seizures, etc.

17.   BPERT and ADHOC pull data from the Enforcement Integrated Database ("EID") and the Enterprise Management Information System-Enterprise Data Warehouse ("EMIS-EDW").  EID is a shared common database repository for several DHS law enforcement and homeland security applications. It captures and maintains information related to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and criminal law enforcement investigations and operations conducted by DHS components, including CBP and U.S. Immigration and Customs Enforcement ("ICE"). EMIS-EDW houses current and historical data from various DHS source systems to provide timely statistical reports and trend analyses to management for situational awareness and the making of critical organizational decisions.

18.   In the case of Yuma Sector and Grand Forks Sector, all complaints or allegations of abuse are reported to OIG or OPR.  There is no local tracking mechanism for complaints in these sectors.

19.   Miami, Ramey, and New Orleans Sectors conducted a review of the FOIA request and determined that they had no instances of alleged misconduct responsive to Plaintiffs' request.

20.   Houlton Sector determined that the only potentially responsive records they possessed concerned the implementation of PREA. It therefore searched its memoranda tracking database and emails of the Patrol Agent in Charge ("PAIC") of each Station and Command Staff using the search term "PREA." Houlton Sector provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

21.   Blaine Sector searched the emails of the PAICs, Deputy Patrol Agents in Charge ("DPAICs"), and Special Operations Supervisor ("SOS"), its Sector shared drive, and local employee drives using the keywords: "children," "custody," "detention," "complaints," "PREA," "allegations," and "abuse." Blaine Sector provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

22.   Buffalo Sector searched the Sector's shared drives, employee drives, emails of the PAIC and other management officials, and EID records using the keywords: "assault," "child," "children," "complaint," "complaints," "confinement," "custody," "hospitalization," "investigation," "juvenile," "juvenile abuse," "mistreatment," "physical abuse," "prison," "prison rape elimination act," "rape," "sexual," "sexual abuse," "verbal," "verbal abuse," and "victims of child abuse act." Buffalo Sector provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

23.   An employee in Tucson Sector conducted a manual search of Tucson Sector's Investigations database, its shared drive, and the SOS's email. No potentially responsive records were located as a result of the search.

24.   San Diego Sector searched its SharePoint site, Operational Support Reference Site, and local shared drive using the keywords: "allegation," "assault," "abuse," "complaint," and "compliance." No potentially responsive records were located as a result of its search.

25.   Laredo Sector searched its shared drive using the keywords: "children," "custody," "juvenile," "juvenile detainees," "abandoned children," "UAC," "unaccompanied alien children," "child abuse," "Victims of Child Abuse Act of 1990," "Prison Rape Elimination Act," "PREA," "complaints of child abuse," "sexual abuse of children," "verbal abuse of children," "physical abuse of children," "children in custody," "investigations of child abuse," and "misconduct involving children." It provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

26.   El Paso Sector searched its Case Tracking System ("Access"), Management Inquiry Team's folder on the shared drive, and the physical archive file storage system using the keywords: "assault," "excessive force," "juvenile," "use of force," "sexual assault," and "allegation of abuse." It provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

27.   Havre Sector used the keywords "juvenile" and "abuse" to search EID and local e-mail files of the PAIC and DPAIC of the Sweetgrass Station, which was the only station within Havre Sector that apprehended juveniles during the time period of Plaintiffs' request. It provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

28.   Spokane Sector searched its shared drive and the Mission Support Director's email using the keywords: "unaccompanied alien children," "victims of child abuse act of 1990," "sexual abuse of children," "verbal abuse of children," "physical abuse of children," "prison rape elimination act," and "children in DHS custody." It provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

29.    El Centro Sector searched its staff's shared drive and local email account of the SOS using the keywords: "prison rape," "PREA," "abuse," "child abuse," "victims of child abuse," "child abuse act," "unaccompanied children," and "children."  It provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

30.    Big Bend Sector searched its network drives, email archives of its PAICs, complaint logs, physical files, and SIR Module using the following search terms:  "UAC," "unaccompanied children," "rape elimination," "complaints," "victims," "abuse," "physical," "sexual," "child abuse act," "policy," "DHS," "juvenile," "children," "allegations," "abuse of minor," "misconduct," "accusations," "reporting," "verbal," "PREA," "confinement," "conditions," "disciplinary," "inspection," "detention," "facility," "treatment," "Prison Rape Elimination Act," and "OIG."  It provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

31.    Del Rio Sector searched the local Labor and Employee Relations ("LER") and Management Inquiry Team ("MIT") hard copy archives.  In addition, it searched the local email archives of its PAIC of Intelligence, Sector Prosecutions Operations Officer, and a Sector Supervisory Border Patrol Agent ("SBPA"), and sector shared drive using the keywords:  "abuse," "assault," "sexual," "child," "children," "juvenile," "juvy," "UAC," "unaccompanied," "allegation," "PREA," "Prison Rape Elimination Act," allegations," "transport," "complaint," and "OIG."  It provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

32.    Swanton Sector searched the staff and supervisory shared drives and the email archives of the Deputy Chief Patrol Agent ("DCPA"), Division Chiefs, and Operations Officer using keywords:  "UAC," "children," "juveniles," and "management inquiries." No potentially responsive records were located as a result of its search.

33.     Detroit Sector searched EID; its shared drive; Outlook emails of the PAICs, DPAICs, and training staff; the National File Tracking System ("NFTS");[2] and its shared drive using keywords: "rape," "juvenile," "detention," "abuse," "complaint," "allegation," "rape prevention," "PREA," "prison rape," "child abuse," "Prison Rape Elimination Act," "Victims of Child Abuse Act," "verbal abuse," "physical abuse," and "sexual abuse." It provided potentially responsive records to USBP, which in turn provided them to CBP FOIA for review and production to Plaintiffs.

**B. Details of HRM's Search**

34.     HRM and one of its component offices, Labor and Employee Relations ("LER"), monitor and integrate the development and implementation of CBP labor and employee relations programs to facilitate an effective CBP workforce. The office is the sole authority within CBP for management of labor and employee relations activities, has direct line authority over HQ and Field LER staff, and assures national level program direction. It provides oversight and evaluation of the management of subordinate organizations, assuring through supervisors that adequate internal controls and performance measures are instituted. The office establishes service-wide policies, programs, and procedures to facilitate effectiveness and operational consistency in areas such as leave administration, performance management, awards, grievances and complaints, fitness for duty, and family friendly initiatives.

35.     HRM services CBP and other DHS components through a web-based tool called the Human Resources Business Engine ("HRBE"), which provides case management and HR business process capabilities to CBP and its DHS component customers. Among HRBE's capabilities is the Employee Relations Case Tracking Function, which tracks and manages records related to DHS employees' disciplinary, performance, medical, and informal counseling cases. Case status updates and basic personnel information is exchanged with

---

[2] NFTS is an automated file tracking system used to maintain an accurate file inventory and track the physical location of files.

1  CBP OPR's Joint Intake Case Management System ("JICMS") through a system-to-system
2  data exchange.  Investigatory material is not stored in HRBE.

3  36.    HRM/LER determined that HRBE was the only location where they were likely to
4  find responsive records. HRM/LER conducted a search of HRBE using the keywords:
5  "minor," "juvenile," "child," "children," "UAC," "conditions," "unaccompanied,"
6  "overcrowded," "frigid cells," "72 hours," "immigrant children," "refugee resettlement,"
7  "bedding," "accommodations," "shackles," "adequate food," "ProBAR," "custody of
8  CBP," "CBP's custody."  No responsive documents were located from this search.[3]

9      **C. Details of OPR's Search**

10  37.    OPR is the component within CBP responsible for ensuring compliance with all
11  CBP-wide programs and policies relating to corruption, misconduct, or mismanagement
12  and for executing internal security and integrity programs.  Upon review of Plaintiffs'
13  request, OPR determined that the Investigative Operations Division ("IOD") was the only
14  office within OPR likely to have responsive records.

15  38.    IOD is responsible for conducting fair, thorough, accurate, timely, and professional
16  investigations into allegations of criminal and other serious misconduct by CBP employees
17  and contractors.

18  39.    JICMS is the OPR system used to record misconduct, to conduct criminal and
19  administrative investigations, and to track disciplinary actions related to CBP and ICE
20  employees and contractors.  It was determined that this system would have any OPR
21  records responsive to Plaintiffs' request.

22  40.    IOD conducted a search of JICMS using keywords: "minor" or "juvenile" or "child"
23  or "children" or "UAC" or "conditions" or "unaccompanied" or "overcrowded" or "frigid
24  cells" or "72 hours" or "immigrant children" or "refugee resettlement" or "bedding" or
25  "accommodations" or "shackles" or "adequate food" or "ProBAR" or "custody of CBP"

26

27  [3] Some documents from HRBE are included in the responsive documents; however, those
28  documents were attachments to Reports of Investigation submitted by other offices as a
result of their searches.

or "CBP's custody" for the time period identified in Plaintiffs' request. IOD produced potentially responsive records to CBP FOIA for processing and production to Plaintiffs.

**D. Details of the SITROOM's Search**

41.    The CBP Commissioner's Situation Room ("SITROOM") is located in CBP HQs and is a 24-hours per day, 7 days per week incident notification and information coordination center. The SITROOM is the primary point of contact for significant incident reporting from all CBP operational components and offices, including ports of entry, sectors, stations, air and marine branches, international offices and CBP Headquarters. It collects all CBP component and offices' reports to provide complete, accurate, and timely reporting to the Commissioner, Deputy Commissioner and CBP senior management.

42.    The SIR Module is used to track and store all of CBP's SIRs. All CBP personnel, whether located domestically or abroad, are required to report significant incidents to the SITROOM. *See* CBP Directive 3340-025D.

43.    The SITROOM used the following keywords to search the SIR Module for records covered by the relevant time period:  "child" or "minor" or "children" or "juvenile" or "UAC" AND one or more of the following:  "abuse" or "hospital" or "rape" or "battery" or "assault" or "conditions" or "overcrowded" or "crowded" or "cold" or "food" or "bed" or "bedding" or "shackle" or "shackles" or "accommodation" or "accommodations" or "unaccompanied" or "medical" or "waste" or "unsanitary" or "feces" or "fecal" or "frigid" or "water."  The SITROOM produced potentially responsive records to CBP FOIA for processing and production to Plaintiffs.

**E. Details of CSCD's Search**

44.    The CSCD, within the Privacy and Diversity Office, is responsible for developing, implementing, and overseeing CBP's efforts to comply with the DHS Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities.

13

45.    CSCD maintains its files regarding allegations of sexual abuse and assault of detainees in CBP's holding facilities on an internal SharePoint website and collaboration website.[4]

46.    Based on its subject matter expertise and knowledge of CSCD systems, CSCD conducted a search of its internal SharePoint website for records responsive to Plaintiffs' request. It sent all potentially responsive records to CBP FOIA for processing and production to Plaintiffs.

### III.    Processing & Production of Documents

47.    Non-exempt portions of responsive records were produced to Plaintiffs on a rolling basis between August 2015 and October 2016. In all, 11,541 pages and 35 audio files were produced with either no or partial redactions as noted in CBP's attached *Vaughn* index. *See* Exhibit 1.

### IV.    CBP's Withholdings Pursuant to FOIA Exemptions

48.    CBP has withheld material pursuant to FOIA Exemptions (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).[5] These withholdings are described below and in the attached *Vaughn* index.

### A.    5 U.S.C. § 552(b)(5): Inter-agency or Intra-agency Memorandums or Letters Which Would Not Be Available by Law to a Party Other than an Agency in Litigation with the Agency

49.    Exemption (b)(5) exempts from mandatory disclosure matters that are "inter-agency and intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption (b)(5) encompasses both statutory privileges and those commonly recognized by case law. The privileges incorporated into this exemption pertain to an agency's decision-making

---

[4] The collaboration website is the same as discussed in footnote 1 above. That database is not searchable.

[5] During the redaction process, CBP mistakenly applied Exemption (b)(2) to certain records that should have been redacted under Exemption (b)(7)(E). The accompanying *Vaughn* index explains where this information should have been, and is properly, redacted under Exemption (b)(7)(E). Explanation for those redactions can be found below.

1   process (i.e., the deliberative process privilege), the attorney work-product privilege, and

2   the attorney-client privilege.

3   50.    In this case, CBP invoked Exemption (b)(5) based upon the attorney-client privilege

4   and the deliberative process privilege.

5   51.    The attorney-client privilege concerns confidential communications between an

6   attorney and his client relating to a legal matter for which the client has sought professional

7   advice, and encompasses opinions given by an attorney to his client based upon, and thus

8   reflecting, those facts.   Attorney-client communications are shielded from disclosure in

9   order to encourage a full and frank discussion between the client and the client's legal

10  advisor.   The attorney-client privilege recognizes that sound legal advice or advocacy

11  depends upon a lawyer being fully informed by his client.

12  52.    CBP has applied Exemption (b)(5) to protect from disclosure portions of declination

13  memoranda between the U.S. Attorney's Office and CBP.  (CBP also asserts Exemption

14  (b)(7)(C) and (b)(7)(E) in withholding parts of this document.)   These memoranda are

15  confidential communications between an attorney and his or her clients related to legal

16  matters for which the client sought professional legal advice.  The exemption was applied

17  to facts divulged to the attorney and the opinions given by the attorney based upon, and

18  thus reflecting, those facts.  If these communications, as covered by the attorney-client

19  privilege, were disclosed, it could result in a chilling effect on interactions and

20  communications between agency employees and their legal counsel.

21  53.    CBP also applied Exemption (b)(5) to protect from disclosure portions of

22  memoranda between CRCL and its general counsel and CBP, discussing pending

23  investigations.   CBP has redacted based on the deliberative process privilege the

24  paragraphs consisting of "Questions Presented."  This information is both pre-decisional

25  and deliberative, and its release could chill the candor of inter-agency and intra-agency

26  communications and have a negative impact on the agency's decision-making and

27  investigative processes.

28       **B.    5 U.S.C. § 552(b)(6): Personnel and Medical Files And Similar Files The**

15

**Disclosure Of Which Would Constitute A Clearly Unwarranted Invasion Of Personal Privacy**

54.    Exemption (b)(6) exempts from mandatory disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This protection is afforded to information that would infringe on the personal privacy of individuals about whom it pertains.   The determination whether disclosure "would constitute a clearly unwarranted invasion of personal privacy" involves a balancing of the public's right to know the information against the individual's right to privacy.

55.    In this case, Exemption (b)(6) was applied to personal information such as names, dates of birth, various identification numbers, addresses, phone numbers, email addresses, photographs, and signatures.  The exemption was applied to the personal information of both government employees, including CBP and local law enforcement personnel, and third parties.  CBP did not, however, apply Exemption (b)(6) as a categorical matter to all such instances of the types of withheld information described in this paragraph.  For example, CBP released names of senior officials whose identities are widely known among the public.

56.    The individual's right to have his or her identity withheld from disclosure clearly outweighs the public interest, if any, in knowing the withheld information described in the paragraph above.  The identification of an individual in association with the performance of duties in an operational context risks the unwarranted attribution and attention to the employee beyond the confines of employment and into personal life, and disclosing the identities of specific individuals would not meaningfully shed light on how the government performs its duties.   To reveal the withheld information would constitute a clearly unwarranted invasion of personal privacy.  With regard to third parties, they likewise have a privacy interest to be free of unwarranted attention, and releasing the identities of third parties merely mentioned in agency records, without their authorization, would violate their legitimate privacy interests.  Whatever minimal interest the public could have in knowing

16

the personally identifying information of third parties does not outweigh the personal privacy interests of these third parties.   Revealing the withheld information would constitute a clearly unwarranted invasion of personal privacy.

57.   As identified in the attached *Vaughn* index, CBP has applied Exemption (b)(6) in numerous instances across many of the documents it has released.  Exemption (b)(6) was often used in conjunction with the other FOIA exemption for personal privacy, Exemption (b)(7)(C), which is explained in further detail below.

C.   **5 U.S.C. § 552(b)(7): Records or Information Compiled for Law Enforcement Purposes**

58.   To be eligible for withholding under Exemption (b)(7), records or information must be compiled for law enforcement purposes.  CBP's law enforcement mission is articulated in paragraph 2 above and explains why the records in which CBP has withheld information under Exemption (b)(7) were compiled for law enforcement purposes.   Records also qualify to the extent they pertain to agency investigations of civil rights violations and/or investigations of employees for particular violations of law.

1)   **5 U.S.C. § 552(b)(7)(C): Records Or Information Compiled For Law Enforcement Purposes Which Could Reasonably Be Expected To Constitute An Unwarranted Invasion of Personal Privacy**

59.   Exemption (b)(7)(C) exempts from mandatory disclosure "records or information compiled for law enforcement purposes" the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. ¶ 552(b)(7)(C).  This exemption protects, among other information, the identity of law enforcement personnel and third parties referenced in files compiled for law enforcement purposes.   The exemption is intended to protect law enforcement personnel from harassment and annoyance in their private lives due to the conduct of their official duties, which could conceivably result from public disclosure of their identities.  The exemption is also intended to protect third parties, whose identities are revealed in law enforcement

17

files, from comment, speculation and stigmatizing connotation associated with being identified in a law enforcement record.   In asserting this exemption, each piece of information was scrutinized to determine the nature and strength of the individual's privacy interest.   In withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure.   In each instance, it was determined that whatever public interest there might be, if any, in knowing the personal information of the individuals identified in the relevant records, it did not outweigh the privacy interests of those individuals.

60.    In this case, Exemption (b)(7)(C) was applied to names, dates of birth, various identification numbers, addresses, phone numbers, email addresses, photographs, and signatures.   As identified in the attached *Vaughn* index, CBP has applied Exemption (b)(7)(C) in numerous instances across many of the documents it has released and often in conjunction with the other FOIA exemption for personal privacy, Exemption (b)(6), as explained above.

           2)     **5 U.S.C. § 552(b)(7)(E): Records Or Information Compiled For Law Enforcement Purposes Which Would Disclose Techniques And Procedures For Law Enforcement Investigations or Prosecutions, Or Would Disclose Guidelines For Law Enforcement Investigations Or Prosecutions If Such Disclosure Could Reasonably Be Expected To Risk Circumvention Of The Law**

61.    Exemption (b)(7)(E) exempts from mandatory disclosure "records or information compiled for law enforcement purposes" that, if released, "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).   CBP is constrained in describing the techniques, procedures, and guidelines covered by its Exemption (b)(7)(E) withholdings, so as to avoid  revealing information CBP seeks to

protect, which is not generally known to the public.  The discussion below thus aims to fairly represent the Exemption (b)(7)(E) withholdings but does not purport to be an all-inclusive rendering of all withheld information, and may be supplemented by information in CBP's *Vaughn* index.

62.   In this case, CBP has invoked Exemption (b)(7)(E) to withhold the following types of law enforcement techniques, procedures, and guidelines:

•   <u>Operational Numbers, Names, and Codes</u>:   File/case numbers, event numbers, FBI numbers, SIR event numbers, subject identification numbers, method of location/apprehension codes, arrest/GPS coordinates, names of law enforcement databases used to conduct investigations, non-public internal web addresses.

•   <u>Intelligence and Strategy</u>:   Records of law enforcement database checks/database query results, instructions on how to deploy databases, information used by law enforcement to identify illicit activity (including intelligence on techniques used by aliens and narcotics smugglers to avoid apprehension), photographs/diagrams of detention facilities, office locator information, references to procedures for law enforcement investigation and prosecution.

•   <u>Staffing Information</u>:  Duty assignments, notification offices, activity logs, and other information indicating available manpower for border and immigration enforcement.

•   <u>Guidance on Law Enforcement Procedures</u>:  Policy memorandum regarding techniques and procedures of CBP's law enforcement personnel following apprehension of an alien attempting to enter the U.S. illegally, detention policies and procedures, including whether to keep groups together and length of detentions, and various other guidance and guidelines regarding investigations, prosecutions, and programs.

63.   Disclosure of the withheld information described in the above paragraphs would risk circumvention of the law by allowing potential violators to better prepare themselves to evade and exploit U.S. immigration border security laws.  If details about the Border Patrol's investigative techniques and surveillance strategies—such as its knowledge of

smuggling routes, concealment tactics, and evasion tactics—became known, smugglers would change their behavior to avoid detection.   Moreover, if information about government capabilities—such as staffing levels and shift times—became known, smugglers could identify areas where and times when they are more or less likely to be interdicted.   Further, disclosing guidelines and other guidance on law enforcement procedures for investigations and prosecutions could highlight potential vulnerabilities that could be exploited by those seeking to avoid legal accountability.   It could enable individuals to alter their patterns of conduct, adopt new methods of operation, relocate, change associations, and effectuate other countermeasures, thereby undermining ongoing investigations and other enforcement efforts.

64.    In addition, information was withheld under Exemption (b)(7)(E) relating to case numbers and other internal codes identifying reports, events, incidents, and subjects (including case numbers and codes used by other agencies, such as the FBI), as well as information that could be used to locate, access, and navigate internal law enforcement computer systems and databases.   This information was withheld to protect CBP's techniques and procedures for identifying, categorizing, and processing law enforcement records, as its release could enable individuals to identify and potentially access law enforcement records without authorization, thereby circumventing the law.   If this information became known, individuals with access to sensitive government systems could attempt to manipulate law enforcement databases and potentially impede government operations.

65.    Under Exemption (b)(7)(E), investigative techniques and procedures are afforded categorical protection; guidelines are protected when their disclosure could reasonably be expected to risk the circumvention of law and regulations, impede effectiveness of law enforcement activities or associations, or endanger CBP investigatory practices and techniques.   Even commonly known techniques and procedures may be protected where the circumstances of their usefulness are not widely known.   Here, disclosure of the information withheld pursuant to this Exemption would inform potential violators of CBP

1  law enforcement guidelines, techniques and procedures, thereby enabling them to
2  circumvent the law, avoid detection, and evade apprehension.

3  **V.     Determination Regarding Segregability**

4  66.     All information CBP has withheld is exempt from disclosure pursuant to a FOIA
5  exemption or is not reasonably segregable—whether because it is so intertwined with
6  protected material that segregation is not possible, or its release would have revealed the
7  underlying protected material.  In responding to Plaintiffs' request, CBP analysts and
8  attorneys reviewed each release of records line-by-line to confirm that any withholdings
9  were proper, examine whether any discretionary waiver of an exemption was warranted,
10  and determine whether any segregable, non-exempt information could be released.  All
11  reasonably segregable portions of the relevant records have been released to Plaintiffs.

12
13  EXECUTED:  February 9, 2017

Patrick Howard
Branch Chief – FOIA Division
U.S. Customs and Border Protection

21